UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| GEORDAN P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-cv-921-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Geordan P. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for Disability Insurance Benefits ("DIB") under Title II of the Act, and his application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 19).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 10, 16. Plaintiff also filed a reply brief. *See* ECF No. 17. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 10) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 16) is **GRANTED**.

## <u>BACKGROUND</u>

Plaintiff protectively filed his application for DIB on September 22, 2015, and his application for SSI on September 26, 2015. Transcript ("Tr.") 172-92. Both applications alleged disability beginning June 1, 2015 (the disability onset date), due to depression, anxiety, bipolar

disorder, sleep apnea, and "sleeping issues." Tr. 172-92, 209. Plaintiff's claims were denied initially on December 15, 2015, after which he requested an administrative hearing. Tr. 78, 79. On March 20, 2018, Administrative Law Judge William Manico (the "ALJ") conducted a video hearing from Alexandria, Virginia. Tr. 15, Tr. 39-77. Plaintiff appeared and testified from Buffalo, New York, and was represented by Jeanne Murray, an attorney. Tr. 15. James Radke, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id.*

The ALJ issued an unfavorable decision on July 12, 2018, finding that Plaintiff was not disabled. Tr. 15-33. On May 15, 2019, the Appeals Council denied Plaintiff's request for further review. Tr. 1-4. The ALJ's July 12, 2018 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.  District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.    The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the

Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his July 12, 2018 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019;

2. The claimant has not engaged in substantial gainful activity since June 1, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*);

3. The claimant has the following severe impairments: anxiety disorder(s) (17F:118); affective disorder(s) (8F:4; 12F:79); posttraumatic stress disorder (PTSD); substance use disorder(s), currently in remission; [and] asthma (20 CFR 404.1520(c) and 416.920(c));

4. The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*);

5. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) and 416.967(c))[1] except: Claimant should avoid concentrated exposure to extremes of heat, cold, humidity odors, dusts, gases, fumes etc. Claimant should avoid exposure to hazards. Claimant retains the mental residual functional capacity to perform unskilled work, which allows him a regular work break approximately every two hours, which does not involve the performance of fast-paced assembly work, which does not involve interacting with the public as part of his job duties, and where interaction with others is limited to occasional;

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7. The claimant was born on August 7, 1991 and was 23 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963);

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he or she is determined to also be able to do sedentary and light work. 20 CFR 416.967(c).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a));

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 15-33.

Accordingly, the ALJ determined that, based on the application for a period of disability and disability insurance benefits protectively filed on September 21, 2015, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 33. The ALJ also determined that based on the application for supplemental security benefits protectively filed on September 26, 2015, the claimant is not disabled under section 1614(a)(3)(A) of the Act. *Id.*

## **ANALYSIS**

Plaintiff asserts two points of error. First, Plaintiff argues that the ALJ cherry-picked the opinion of consultative psychological examiner Gina Zali, Psy.D. ("Dr. Zali") and failed to conduct a specific inquiry into Plaintiff's capacity for stress. *See* ECF No. 10-1 at 16, 18-21. Second, Plaintiff argues that the ALJ erred in "rejecting" the opinion of Angelina Delgosha, LCSW-R ("Ms. Delgosha"), Plaintiff's treating therapist at WNY Psychotherapy Services ("WNY Psychotherapy"), without properly evaluating the opinion and failing to obtain the complimentary treatment notes. *See id.* at 23-27. According to Plaintiff, these errors resulted in a decision not supported by substantial evidence. *See id.* at 16-27,

The Commissioner responds that, contrary to Plaintiff's arguments, the ALJ properly considered the medical opinion evidence and provided an adequate explanation for not adopting Dr. Zali's marked stress limitation. *See* ECF No. 16-1 at 19-27. Accordingly, argues the Commissioner, substantial evidence supports the mental limitations assessed by the ALJ. *See id*.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

After a thorough review of the ALJ's decision and the medical records in this case, the Court finds that the ALJ properly evaluated the medical opinion evidence, and his conclusion that Plaintiff could perform unskilled work that did not involve fast-paced assembly work, interacting with the public, or more than occasional interaction with coworkers or supervisors was supported by substantial evidence. Tr. 21. As the ALJ acknowledged, the record indicated that Plaintiff had some limitation in his ability to manage stress due to his history and PTSD, but the record as a whole established no more than moderate restrictions. Tr. 29. Furthermore, the ALJ provided more than ample reason for discounting Ms. Delgosha's opinions, and because the record before the ALJ sufficiently documented Plaintiff's mental impairments and treatment, the ALJ was not required to seek out additional records from Ms. Delgosha.

In June 2014, Plaintiff visited his primary care provider, R. Keith Felstead, D.O. ("Dr. Felstead"), of Primary Care of Western New York, LLP ("PC of WNY"), for evaluation of possible attention deficit hyperactivity disorder ("ADHD"). Tr. 290, 304. Plaintiff complained of feeling

depressed with little interest or pleasure in doing things; he reported suicidal thoughts but denied anxiety. Tr. 290. Upon examination, Plaintiff displayed a subdued mood and normal affect. Tr. 291. He admitted that he was not using his CPAP machine, and Dr. Felstead encouraged Plaintiff to use his CPAP and to discontinue using alcohol, tobacco, and marijuana. *Id*. Dr. Felstead prescribed Wellbutrin XL. *Id*.

In August 2014, Plaintiff received nine days of inpatient treatment at BryLin Hospitals ("BryLin") for complaints of depression and fleeting suicidal ideation. Tr. 267-81, 473-76. He had no prior psychiatric treatment but reported a history of cutting himself. Tr. 267. He drank alcohol two or three times per week with a history of blackouts, and he also used marijuana periodically to "elevate [his] mood." *Id*. He denied any psychotropic or manic symptoms. *Id*. Plaintiff lived with his parents and worked part time, and he had one year of college credits. *Id*. A mental status examination showed fair eye contact, a restricted affect, and no gross cognitive deficits. Tr. 268. Plaintiff appeared cooperative but somewhat withdrawn and preoccupied. *Id*. He reported fleeting suicidal ideations with no plan or intent. *Id*. A drug screen was positive for cannabis. Tr. 270. During his hospital course, Plaintiff showed significant improvement with antidepressant medication and group and individual therapy. Id. He appeared stable at discharge, but said he still needed some time off work. *Id*.

On September 17, 2014, Plaintiff received treatment at Erie County Medical Center for suicidal ideation and alcohol intoxication. Tr. 282-85, 506-16. Plaintiff mentioned thoughts of suicide while drinking with friends, and a friend called emergency services. Tr. 285. Plaintiff reported his recent hospitalization at BryLin for depression and alcohol abuse and reported no prior suicide attempts. Tr. 282. Upon examination, Plaintiff appeared calm, polite, and in no acute distress. Tr. 283. He had fair eye contact, fair hygiene, normal speech, a depressed mood, and

restricted affect. Tr. 283. He admitted to prior suicidal ideations without plan or intent. *Id*. He said

he drank alcohol regularly and had trouble sleeping. Tr. 285. He also reported nightmares related

to witnessing sexual molestation involving his grandfather and brother when he was six years old.

*Id*. He was encouraged to continue outpatient treatment and abstain from alcohol use. *Id*.

Two months later, on November 14, 2014, Plaintiff visited Dr. Felstead for treatment of a

cough. Tr. 292, 306. He said his antidepressant medication had been helpful and his mood was less

depressed. Tr. 292. He denied anxiety or depression and said he had stopped using marijuana and

drank two alcoholic beverages per week. *Id*. Upon examination, Plaintiff had a normal mood and

affect. Tr. 293.

In February 2015, Plaintiff returned to Dr. Felstead's office to discuss his antidepressant

medication. Tr. 295, 309. Plaintiff reported that his medication no longer seemed to be working.

Tr. 295. He rated his depression as moderate in severity, and he denied anxiety or suicidal thoughts.

*Id*. Plaintiff displayed detachment and subdued mood during his appointment, and he had fair eye

contact, intact judgment, and appropriate insight. Tr. 296. Plaintiff was to continue taking Celexa

and was also prescribed Wellbutrin. *Id*.

Five months later, on July 1, 2015, Plaintiff returned to see Dr. Felstead to discuss his

medications. Tr. 298, 312, 407. He reported increased depression, difficulty sleeping, fatigue, and

anxiety. Tr. 298, 458. Upon examination, Plaintiff appeared depressed with a flat affect, and he

had impaired judgment and limited insight. Tr. 298. Dr. Felstead referred Plaintiff to Horizon for

evaluation of possible bipolar disorder. Tr. 300.

On September 24, 2015, Plaintiff attended a psychiatric evaluation at Horizon. Tr. 316-20.

He reported feelings of depression since his mid-teens with anxiety, panic attacks, and difficulty

sleeping. Tr. 318. He also reported experiencing manic episodes when he wanted to go out and be

social. Tr. 318. Although he had difficulty describing his mood during these times, he said he did

not feel irritable or agitated. *Id*. His mother stated that he recently started using his CPAP machine

and was sleeping much better. *Id*. Plaintiff reported social anxiety, constant worrying, and fatigue,

as well as nightmares and flashbacks related to witnessing physical and sexual abuse of someone

else. *Id*. Plaintiff said he drank five to six beers once or twice a week and had not used marijuana

since August. Tr. 319. Upon examination, Plaintiff appeared mildly restless but well-groomed with

appropriate behavior, good eye contact, dysphoric mood, appropriate affect, normal speech, logical

thought process, and good concentration. Tr. 316-17.

During a psychiatric examination at Horizon on October 22, 2015, Plaintiff described his

mood as "alright," and he denied any significant depression, mania, or irritability. Tr. 321-24. He

reported two recent anxiety attacks with no known trigger. Tr. 323. A mental status examination

showed a euthymic mood and constricted affect. Tr. 321.

On November 10, 2015, Plaintiff attended a consultative psychiatric evaluation with Dr.

Zali. Tr. 325-29. Plaintiff said he had completed high school a year and a half of college. Tr. 325.

He had previously worked at a 7/11 for seven years, and he had last worked as a customer service

representative for about five months. Tr. 325. He said he left his job in May 2015 due to anxiety,

panic attacks, and depression. *Id*. He reported two hospitalizations in 2014 for suicide attempts.

*Id*. He reported low motivation, difficulty sleeping, irritability, and dysphoric moods and

flashbacks of sexual and physical abuse from his grandfather when he was three or four years old.

Tr. 326. He said he only experienced flashbacks when he did not use his CPAP. *Id*. He also reported

weekly panic attacks consisting of sweating and muscle tension and said he had paranoid ideation

of being arrested or someone coming through the door. *Id*. He lived with his parents, who did the

shopping, cooking, and cleaning, but Plaintiff did his own laundry once a month. Tr. 328. He did

not manage his own money, but he could drive. *Id*. He enjoyed watching television and socializing with friends. *Id*.

Upon examination, Plaintiff appeared unkempt and disheveled with poor personal hygiene and poor grooming. Tr. 327. He had an immature demeanor, fair manner of relating, slouched posture, restless motor behavior, and appropriate eye contact. *Id*. He had a dysthymic mood and full affect. *Id*. He displayed intact attention and concentration, intact memory skills, average cognitive functioning, and fair insight and judgment. Tr. 327-28. Dr. Zali opined that Plaintiff exhibited no evidence of limitation in his ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks, or perform complex tasks. Tr. 328. She said Plaintiff had mild limitations in his ability to maintain a regular schedule and relate adequately with others. *Id*. Dr. Zali opined that Plaintiff had a moderate limitation in making appropriate decisions and a marked limitation in appropriately dealing with stress (Tr. 328) and recommended continued mental health treatment and vocational training and rehabilitation (Tr. 329).

The next day, on November 11, 2015, Plaintiff told Dr. Felstead that he was seeking social security disability. Tr. 350. He said he slept "ok" with trazodone. *Id*. Upon examination, Plaintiff had a normal mood and affect, intact judgment, and appropriate insight. Tr. 351.

In December 2015, Plaintiff was voluntarily admitted to BryLin, complaining of increased panic attacks, increased anxiety, difficulty getting out of the house, poor motivation, and suicidal ideation with a plan to cut his wrist. Tr. 362-65, 477-80. He reported he lived with his parents and was unemployed. Tr. 362. He said he had last used marijuana one week before. *Id*. Upon examination, Plaintiff appeared fairly groomed with appropriate eye contact, anxious mood, and congruent affect; he had intact memory, average intelligence, and fair insight and judgment *Id*.

During his hospital stay, Plaintiff was started on individual and group therapy and prescribed a mood stabilizer and. Tr. 363. He was discharged four days later, at which time he had a euthymic mood and denied depression or anxiety. *Id*. He was advised to continue outpatient treatment. *Id*.

On December 15, 2015, state agency medical consultant A. Dipeolu, Ph.D. ("Dr. Dipeolu"), reviewed the record and opined that Plaintiff appeared cognitively intact. Tr. 86. 97, 469. Dr. Dipeolu further opined that, considering Plaintiff's difficulties dealing with stress, his ability to deal with co-workers and the public would be somewhat reduced, but adequate to handle brief and superficial contact. Tr. 86, 97, 469. Similarly, Dr. Dipeolu opined that Plaintiff's ability to tolerate and respond appropriately to supervision would be reduced, but adequate to handle ordinary levels of supervision in the customary work setting. Tr. 86, 97, 469.

On December 16, 2015, Plaintiff visited Dr. Felstead for medication refills. Tr. 353. He reported anxiety but denied depression, homicidal thoughts, and suicidal thoughts. *Id*. He said he felt much better, and his new medications were helpful. *Id*. A physical examination showed a normal mood and affect with intact judgment and appropriate insight. Tr. 354.

On December 30, 2015, Plaintiff was discharged from Horizon. Tr. 387-90. The discharge record indicates that a drug screen in October 2015 had been positive for amphetamines and benzodiazepine. Tr. 389. Plaintiff insisted that a friend had slipped these drugs into his drink. *Id*. A repeat drug screen in November 2015 was positive for benzodiazepine, cocaine, and alcohol. *Id*. Plaintiff failed to attend an appointment on December 24, 2015. *Id*. On December 29, 2015, Plaintiff spoke with his therapist and indicated that he was transferring his outpatient mental health care to BryLin. *Id*.

In January 2016, Plaintiff received inpatient treatment at BryLin for alcohol intoxication, depression, and anxiety. Tr. 356-58, 481-85. He reported that he had been cutting himself on his

11

arm. Tr. 356. He also reported he continued to use marijuana and alcohol. *Id*. He received individual and group therapy and medication management during his hospital stay. He progressively became less depressed and less anxious and did not have panic attacks. Tr. 357. Plaintiff was discharged home and advised to continue outpatient mental health treatment. *Id*.

Later that month, on January 27, 2016, Plaintiff initiated mental health treatment at Mid Erie Counseling ("Mid Erie") with Raymond Lorigo, LMSW ("Mr. Lorigo"). Tr. 544. In February 2016, Plaintiff discussed his childhood with Mr. Lorigo and stated he had few friends. Tr. 548. He said he witnessed his father's bipolar disorder as a child and began having his own symptoms at age 11 or 12. *Id*. Plaintiff did not attend a counseling appointment on February 22, 2016. Tr. 550. When Mr. Lorigo called Plaintiff's home, his father said he was unable wake him for his appointment. *Id*. His father also reported that he and Plaintiff had a "significant fight" the night before because Plaintiff wanted one of his father's valium pills. Tr. 551. Plaintiff eventually convinced his father to drive him to get a "4 loco" (an alcoholic energy drink). *Id*. Plaintiff's father said that Plaintiff had a sense of entitlement that was difficult for the family. *Id*.

On February 24, 2016, Plaintiff attended a psychiatric consultation with Sanjay Gupta, M.D. ("Dr. Gupta"), at Mid Erie. Tr. 525. Plaintiff reported a history of abuse at a young age from his grandfather who was now deceased and said he was unable to function at school because of anxiety, irritable mood, and depression. *Id*. Plaintiff admitted to drinking alcohol and smoking marijuana regularly. *Id*. Upon mental status examination, Plaintiff appeared disheveled and malodorous. *Id*. He had a depressed and anxious mood and appropriate affect. *Id*. Dr. Gupta assessed Plaintiff with post-traumatic stress disorder ("PTSD") and alcohol dependence and adjusted Plaintiff's medications. *Id*.

Plaintiff saw Mr. Lorigo for counseling on March 1, 2016. Tr. 553. Plaintiff discussed relationship problems with a friend and said he used video games, television, and substances as coping mechanisms. *Id*. Plaintiff stated that he was not yet feeling any relief from his meds, but he denied any side effects. *Id*. Plaintiff identified his anxiety triggers as "thinking about his childhood and people in general." *Id*. Mr. Lorigo discussed CPT (cognitive processing therapy) to address Plaintiff's childhood traumas, but Plaintiff stated, "he does not do homework." *Id*.

Plaintiff returned to see Mr. Lorigo for counseling on March 10, 2016. Tr. 555. He said his mood had been better because he was spending time with his friend. *Id*. Plaintiff said in the past he had been interested in building and working on computers, playing video games, reading novels, and playing ping-pong, hockey, and football. *Id*. He said he needed to get a new and more challenging video game to feel motivated to do outside activities. *Id*.

A few days later, on March 14, 2016, Plaintiff followed up with Dr. Gupta for medication management. Tr. 526. He reported sleeping well with 80% improvement in his nightmares. *Id*.  He described his mood as improved; his affect was appropriate to mood; and Dr. Gupta adjusted Plaintiff's antidepressant medications. *Id*.

The following week, on March 22, 2016, Plaintiff had a follow-up primary care appointment with PC of WNY. Tr. 335. Plaintiff reported improvement with medication but also reported occasional panic attacks and suicidal ideations. *Id*. A physical examination showed a normal mood and affect. Tr. 336.

Plaintiff returned to see Mr. Lorigo for counseling on April 6, 2016. He reported some improvement in anxiety, sleep, and nightmares with medication. *Id*. He also reported a reconciliation with his friend. *Id*. Plaintiff described his typical day as waking up between three o'clock and six o'clock in the afternoon, eating, watching television, going to a friend's house

once or twice a week, and going to bed between three o'clock and six o'clock in the morning. *Id*. Mr. Lorigo observed that Plaintiff's depression and pessimism are ways of dealing with trauma which "fits very well" with a diagnosis of PTSD. *Id*. Plaintiff agreed but told Mr. Lorigo that he was unsure what he wanted from therapy. *Id*. Mr. Lorigo gave Plaintiff a "10 Pleasant or Fun Things" worksheet, which Plaintiff left in the office. *Id*. Mr. Lorigo subsequently mailed Plaintiff the worksheet. *Id*.

On April 11, 2016, Plaintiff followed up with Dr. Gupta for medication management. Tr. 527. Plaintiff said he was sleeping well, but he had low motivation and anxiety. *Id*. On the same day, Plaintiff told Mr. Lorigo that he shut down in therapy sessions because Mr. Lorigo asked too many questions and put him on the spot. Tr. 562. Later that month, Plaintiff reported increased inactivity and depression. Tr. 565. He discussed the "pleasant activities" worksheet with Mr. Lorigo and identified activities that brought him pleasure, such as exploring nature and helping an elderly woman load up her car. *Id*. The following week, Plaintiff told Dr. Gupta that he slept 8 to 10 hours per night and was doing better with nightmares. Tr. 528. He reported an overall improvement of 40%. *Id*.

On May 4, 2016, Plaintiff told Mr. Lorigo that he kept his emotions "bottled up" because "he does not like to be exposed." Tr. 568. They discussed Plaintiff's lack of close personal relationships and his spontaneous actions such as drinking to allow himself to feel. *Id*. On May 23, 2016, Plaintiff told Dr. Gupta that he was doing well with his medication. Tr. 529. He reported some dizzy spells and nightmares twice per week. *Id*.

On May 25, 2016, Plaintiff's parents took him to the hospital after finding him on the floor in an "altered mental state." Tr. 374-83, 391-97, 415, 424, 426-36, 656-737. Plaintiff had taken an unknown quantity of baclofen at a friend's house. Tr. 374. His parents also suspected he had taken

an excessive amount of Zoloft. Tr. 375. A head CT showed "no acute process." Tr. 378, 399. Plaintiff admitted he had tried to self-treat by taking a friend's medication for "restless leg syndrome," and he did not intend to harm himself. Tr. 391, 396, 416. Plaintiff's symptoms resolved with treatment, and he was discharged on May 27, 2016.  Tr. 416. He was instructed to follow up with his primary care physician and psychiatry, and he was advised to consider counseling with addiction services. *Id.*

A few days later, on May 31, 2016, Plaintiff followed up with his primary care provider. Tr. 437.  He told his provider that he took 10 to 12 baclofen over the course of 3 to 6 hours, believing it was an over-the-counter medication that would help with restless leg syndrome. Tr. 437. On the same day, Plaintiff told Mr. Lorigo that he took baclofen from his friend hoping it would help with restless leg syndrome and said he did not know it was a prescription medication. Tr. 575.

In June 2016, Plaintiff told Mr. Lorigo that he had begun using an electronic cigarette in an attempt to quit smoking. Tr. 578. They discussed using mindfulness exercises as a therapeutic tool. Tr. 578, 581. Plaintiff told Dr. Gupta that he was doing well with no nightmares and no manic symptoms. Tr. 530.

In July 2016, Plaintiff told Mr. Lorigo that he had a girlfriend and the relationship had been "very good for him," although their increasing sexual encounters triggered flashbacks. Tr. 584. He also reported that medication had stopped his nightmares. Tr. 591.

Dr. Gupta adjusted Plaintiff's medications in August 2016. Tr. 531-32. Plaintiff reported this his nightmares were "completely gone," and he described his mood as "okay." Tr. 532. Plaintiff talked to Mr. Lorigo about the ups and downs of his relationship with his girlfriend (Tr.

594, 597, 600), and they discussed places Plaintiff felt safe and the people he could rely on to protect and console him (Tr. 600).

On August 27, 2016, Plaintiff received emergency treatment for an overdose of baclofen and Adderall. Tr. 487-504, 518-21. A chest x-ray and head CT were normal. Tr. 522-23. A drug screen was positive for amphetamines, benzodiazepines, and methadone. Tr. 494. Plaintiff was admitted for overnight observation. Tr. 502.

In September 2016, Plaintiff talked to Mr. Lorigo about his relationships with his girlfriend, who he described as "very needy," and with his best friend, who had started using heroin again. Tr. 603, 609. Plaintiff also discussed his love of watching sports and his efforts to lose weight. Tr. 606. In October 2016, Plaintiff reported he had broken up with his girlfriend and was involved in football season and fantasy football. Tr. 612. He said he changed medication management providers and felt his new anxiety medication was helping. Tr. 615.

In November 2016, Plaintiff told Mr. Lorigo that he "felt great" with Xanax and was "just [himself] without anxiety." Tr. 618. He said he slept 10 hours a night. *Id*. Plaintiff returned to see Dr. Felstead on November 23, 2016. Tr. 339. He complained of acid reflux and restless legs. *Id*. He reported PTSD symptoms but denied anxiety or depression. *Id*. He had a normal mood and affect. Tr. 340.

In January 2017, Plaintiff told Mr. Lorigo that he did not have anxiety with Xanax, and he could feel other emotions such as excitement. Tr. 623. He said this helped with motivation, and he talked about getting an exercise bike. *Id*. In February 2017, Plaintiff reported he felt more aware of his surroundings and noticed more going on around him. Tr. 627. He told Mr. Lorigo that he was not ready to challenge his PTSD memories. Tr. 630.

In March 2017, Plaintiff discussed his increased nightmares with Mr. Lorigo. Tr. 633. Mr. Lorigo stated that because Plaintiff did not appear ready to challenge his substance abuse, his therapy was "somewhat at a standstill, and they discussed putting therapy "on hold." *Id.* In April 2017, Plaintiff told Mr. Lorigo that his medication regimen seemed to be helping well, and he talked about quitting smoking and lifting weights. Tr. 636. They again discussed terminating the therapy, but Plaintiff stated he did not "feel comfortable" terminating because he needed Mr. Lorigo as a "safety net." *Id.*

On May 17, 2017, Plaintiff visited Dr. Felstead for an annual physical. Tr. 342. He expressed interest in losing weight. *Id.* He reported he was not using his CPAP regularly. *Id.* He denied anxiety or depression. Tr. 343. Plaintiff had a normal mood and affect. Tr. 344. Dr. Felstead recommended aerobic exercise and encouraged Plaintiff to use his CPAP. Tr. 345-46. During a counseling session on May 22, 2017, Plaintiff told Mr. Lorigo that he had been lifting weights significantly and his grandmother had passed away. Tr. 638. He expressed interest in trying PTSD desensitization. *Id.*

In July 2017, Plaintiff had a counseling appointment with Sarah Sabatowski at Mid Erie. Tr. 641. He reported some depression with the death of his grandmother and some panic attacks, but he denied feeling suicidal. *Id.* He expressed little motivation to change, and he was obsessing about past events that he felt "kept him stuck." Tr. 644. In August 2017, Plaintiff said he gave his "therapy homework papers" to his mother and did not see them again. Tr. 646. His father called later that month and reported that Plaintiff was not connecting with his new counselor and would be switching to a new provider. Tr. 648.

In November 2017, Plaintiff followed up with Dr. Felstead. Tr. 402. He reported feeling depressed because he lost a friend to a heroin overdose. *Id.* He denied anxiety or suicidal thoughts.

*Id*. The following month, Plaintiff reported feeling a little better. Tr. 410. He was trying to see a new psychiatrist but had "limited options." *Id*. He denied anxiety and complained of depression, insomnia, irritability, and PTSD. *Id*.

On January 23, 2018, Ms. Delgosha completed a mental functioning questionnaire. Tr. 464-68. She stated that Plaintiff had been seen two to four times a month since August 24, 2017. Tr. 464. She checked boxes indicating that Plaintiff was "unable to meet competitive standards" or had "no useful ability to function" in 20 of 25 mental abilities and aptitudes categories, including: (1) Remember work-like procedures; (2) Understand and remember very short and simple instructions; (3) Carry out very short and simple instructions; (4) Maintain attention for two-hour segments; (5) Make simple work-related decisions; (6) Get along with coworkers or peers; (7) Deal with normal work stress; and (8) Interact appropriately with the public. Tr. 466-67.

Ms. Delgosha also checked boxes indicating that Plaintiff was "seriously limited" in his ability to maintain socially appropriate behavior and maintain regular attendance and be punctual within customary tolerances. Tr. 466-67. She indicated that Plaintiff had "limited but satisfactory" ability to ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, and adhere to basic standards of neatness and cleanliness. *Id*. Ms. Delgosha indicated that Plaintiff would likely miss work more than four days per month due to his impairments. Tr. 468. She opined that he could not engage in full-time competitive employment on a sustained basis and stated that these limitations applied since 2010. *Id*.

On April 3, 2018, Ms. Delgosha wrote a letter to Plaintiff's attorney stating that Plaintiff had been compliant with two to four therapy sessions per month since August 2017. Tr. 739. She said that Plaintiff experienced symptoms of severe to extreme depression, anxiety, and PTSD. *Id*. She also said that although Plaintiff appeared to be motivated to get better, he visibly struggled to

carry out activities of daily living. *Id*. Ms. Delgosha stated that Plaintiff had no signs of alcohol or drug use. *Id*. She opined that due to the severity and duration of his symptoms, Plaintiff was not able to work or function optimally in an academic or occupational setting. *Id*.

Plaintiff first challenges the ALJ's evaluation of Dr. Zali's consultative psychological opinion. *See* ECF No. 10-1. at 16, 18-21. Contrary to Plaintiff's argument, the ALJ properly considered the medical opinion evidence and substantial evidence in the record supports the mental limitations assessed. The ALJ considered the medical opinion evidence in accordance with the regulations. Tr. 28-30. *See* 20 C.F.R. §§ 404.1527, 416.927.1 The ALJ gave great weight to the medical opinions of state agency reviewing psychologist Dr. Dipeolu, as well as Dr. Zali, Tr. 29-30, 86, 97, 328-29, 469. While the ALJ's RFC limitations did not mirror either of these opinions, the ALJ's findings were consistent with both opinions. *See Rodriguez v. Comm'r of Soc. Sec.*, No. 17-CV-6006-FPG, 2018 WL 4681624, at *7 (W.D.N.Y. Sept. 28, 2018) (ALJ did not err in weighing the various medical opinions: "Here, the ALJ did not adopt any opinion in its entirety. However, several RFC findings were consistent with portions of each opinion.").

First, the ALJ considered Dr. Zali's November 2015 consultative examination report and opinion. Tr. 28-29, 325-29. The ALJ generally agreed with Dr. Zali's assessment, which indicated that Plaintiff could understand and perform simple tasks but had some limitations interacting with others. Tr. 28, 328. However, the ALJ did not adopt Dr. Zali's statement that Plaintiff had a marked restriction in appropriately dealing with stress. Tr. 28-29, 328. As Plaintiff noted in his brief, Dr. Zali's examination was a one-time snapshot, reflecting Plaintiff's functioning on the date of the examination. *See* ECF No. 10-1. at 25. However, considering the record as a whole, the ALJ found that Plaintiff's symptoms caused no more than moderate restrictions. Tr. 29.

Plaintiff accuses the ALJ of "cherry-picking" Dr. Zali's opinion, by rejecting her opinion of marked limitations in appropriately dealing with stress. *See* ECF No. 10-1 at 16-19. While Plaintiff is correct that an ALJ is not permitted to "cherry pick" information, an ALJ is free to reject portions of medical opinion evidence not supported by, and even contrary to, objective evidence of record while accepting those portions supported by the record. *See Veino v Barnhart*, 312 F.3d at 588; *see also Barry v. Colvin*, 606 F. App'x 621, 623-24 (2d Cir. 2015) (ALJ is not bound to accept all portions of a consultative examiner's report); *Matthews v. Comm'r of Soc. Sec.*, No. 1:17-cv-00371-MAT, 2018 WL 4356495, at *3 (W.D.N.Y. Sept. 13, 2018) ("In resolving evidence, an ALJ is entitled to accept parts of a doctor's opinion and reject others. . . . However, an ALJ may not credit some of a doctor's findings while ignoring other significant deficits that the doctor identified without providing some reasonable explanation.") (internal quotations and citations omitted). Contrary to Plaintiff's accusation, the ALJ provided an adequate explanation for not adopting Dr. Zali's marked stress limitation. Tr. 28-29, 328.

As the ALJ acknowledged, the record indicated that Plaintiff had some limitation in his ability to manage stress due to his history and PTSD. Tr. 29. However, the record as a whole established no more than moderate restrictions. Tr. 29. The ALJ noted that, despite a history of depression dating back to his teens, Plaintiff graduated from high school, attended a year of college, and worked for several years thereafter. Tr. 27, 29, 48, 210, 318. Likewise, although Plaintiff began experiencing PTSD symptoms in 2011 when his grandfather came back into his life, he was able to work for several years thereafter at a 7/11 without any PTSD incidents; and he quit because of a disagreement with his supervisor, not for reasons related to his impairments. Tr. 27, 51, 326. Additionally, the ALJ noted that although Plaintiff had difficulty dealing with the

public at the collections call center, he reported no difficulty getting along with authority figures and no difficulty working in close proximity to others. Tr. 27, 58-59, 224.

Plaintiff also argues that his school and work history are immaterial to his alleged period of disability. *See* ECF No. 10-1 at 19-20. While Plaintiff's school and work activity predated his alleged onset date, they are nevertheless relevant to the ALJ's analysis as Plaintiff admitted to doing these activities with the same impairments that he claimed became disabling. *See DeRosia v. Colvin*, No. 16-CV-6093P, 2017 WL 4075622, at *22 (W.D.N.Y. Sept. 14, 2017) (finding the claimant's allegations of mental disability weakened by her ability to maintain competitive employment despite longstanding cognitive difficulties). Despite Plaintiff's argument, the ALJ properly considered his past school and work history as one factor in determining that he could perform unskilled work with some limitations in social interaction. Tr. 29.

The ALJ further considered that Plaintiff's medical records suggested that he could perform a range of unskilled work. Tr. 29. As the ALJ discussed, the record showed that Plaintiff's symptoms generally improved with treatment compliance. Tr. 23. It is proper for the ALJ to consider improvement with treatment. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013). In this case, Plaintiff's mood improved, and his nightmares resolved with medication. Tr. 23-24, 335, 353, 526-30, 532, 559, 591, 615, 636. Plaintiff said he felt "great" after starting Xanax in November 2016, and he later denied symptoms of depression and anxiety. Tr. 24, 339, 343, 618, 623. Indeed, records from Plaintiff's primary care providers generally documented normal mood and affect. Tr. 24, 336, 340, 344, 351, 354. Overall, the ALJ found that Plaintiff's mental health symptoms were stable when on his medications and not abusing alcohol or drugs. Tr. 27.

As noted above, the ALJ also gave great weight to the opinion of state agency psychologist Dr. Dipeolu. Tr. 30, 86, 97, 469. Notably, Plaintiff does not take issue with the ALJ's evaluation

of Dr. Dipeolu's opinion. After considering Dr. Zali's consultative report, Dr. Dipeolu accounted for Plaintiff's difficulties dealing with stress by limiting him to brief and superficial contact with the public and coworkers. Tr. 86, 97, 469. Dr. Dipeolu further indicated that Plaintiff's ability to tolerate and respond appropriately to supervision was reduced, but adequate to handle ordinary levels of supervision in the customary work setting. Tr. 86, 97, 469. Consistent with Dr. Dipeolu's opinion and the medical treatment records, the ALJ accounted for Plaintiff's difficulties dealing with stress by limiting him to unskilled work that did not involve interacting with the public and no more than occasional interaction with others. Tr. 21.

Plaintiff also claims that the ALJ failed to conduct a specific inquiry into his capacity for stress. *See* ECF No. 10-1 at 16-17 (citing SSR 85-15). SSR 85-15 states: "it is not unusual that the mentally impaired have difficulty accommodating to the demands of work and work-like settings," and "[t]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances." SSR 85-15. As a result, SSR 85-15 recognizes that "[d]etermining whether these [mentally impaired] individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult," and "requires careful consideration of the assessment of RFC," including whether the individual retains the ability "to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id*. In considering whether an individual is capable of working despite any difficulties attributable to his or her mental impairments, SSR 85-15 thus "emphasizes the importance of thoroughness in evaluation on an individualized basis," and explains that "[a]ny impairment-related limitations created by an individual's response to demands of work…must be reflected in the RFC assessment." *Id*.

Despite Plaintiff's argument, the ALJ here conducted such a thorough evaluation in accordance with SSR 85-15's guiding principles emphasizing the individualized nature of the inquiry. The ALJ acknowledged that Plaintiff might have some difficulties dealing with stress and interacting with others (Tr. 29) and accounted for this in the RFC finding by limiting Plaintiff to unskilled work that did not involve fast-paced assembly work, interacting with the public, or more than occasional interaction with coworkers or supervisors (Tr. 21). *See Herb v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 441, 447 (W.D.N.Y. 2019), "(an RFC limiting a plaintiff to occasional interaction with co-workers and the public, and to the performance of simple, routine tasks, may account for the plaintiff's stress-related limitations"); *see also Cosme v. Colvin*, 2016 WL 4154280, *13 (W.D.N.Y. 2016) (limitations to unskilled work that did not require any contact with coworkers or the public and only limited contact with supervisors "adequately accounted for [claimant's] limitations, including any limitations dealing with stress"); *Moxham v. Comm'r of Soc. Sec.*, No. 3:16-CV-1170 (DJS), 2018 WL 1175210, at *10 (N.D.N.Y. Mar. 5, 2018) (limitation to "simple tasks and instructions, decisions on simple work-related matters, and frequent interaction with others" adequately accounted to the plaintiff's stress-related limitations).

As Plaintiff indicated that his stress related to interaction with others, the ALJ's RFC finding properly addressed Plaintiff's ability to deal with stress. Tr. 21. The record in this case reflects that, in assessing work-related mental limitations as a part of the RFC finding, the ALJ considered whether Plaintiff "w[ould] be able to adapt to the demands or 'stress' of the workplace" despite the difficulties attributable to his mental impairments. Tr. 21, 29.

Based on the foregoing, and considering the record as a whole, the Court finds that the ALJ complied with SSR 85-15's directive that "[a]ny impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment."

SSR 85-15; *see, e.g., Reyes v. Colvin*, No. 14-CV-734-JTC, 2016 WL 56267, at *6 (W.D.N.Y. Jan.

5, 2016) ("In the court's view, although the ALJ did not specifically include stress limitations in

his RFC assessment, his reliance on the findings and observations of the consultative medical

sources in terms of their consideration of plaintiff's stress-related functional limitations, as well as

his comprehensive consideration of the hearing testimony, objective medical evidence, and

treating and consultative medical source opinions, represents the kind of thorough, individualized

mental RFC evaluation contemplated by SSR 85-15 and the overall requirements of the Social

Security regulations and rulings."). Accordingly, the Court finds no error with respect to any

alleged failure to comply with SSR 85-15.

Finally, the ALJ considered but gave little weight to the opinions of Ms. Delgosha,

Plaintiff's most recent mental health counselor. Tr. 29-30, 464-68, 739. First, the ALJ noted that

Ms. Delgosha was not an acceptable medical source under the regulations, and her opinions were

not entitled to any special weight. Tr. 30. *See* 20 C.F.R. §§ 404.1502, 416.902; *Conlin v. Colvin*,

111 F. Supp. 3d 376, 386 (W.D.N.Y. 2015). In addition, the ALJ noted that Ms. Delgosha's

statements that Plaintiff was not able to work were not medical opinions, but rather, were opinions

on the ultimate issue of disability, which are reserved to the Commissioner. Tr. 30. *See Wynn v.

Comm'r of Soc. Sec.*, 342 F. Supp. 3d 340, 346 (W.D.N.Y. 2018) (ALJ appropriately discounted

other source opinion that claimant was unable to work due to severe anxiety and depression; ALJ

properly observed that the "statement that Plaintiff was unable to work was an opinion on the

ultimate issue of disability, an issue that is ultimately reserved to the Commissioner").

The ALJ also found that the evidence as a whole did not support the restrictions assessed

by Ms. Delgosha. Tr. 29-30, 466-67. Significantly, although Ms. Delgosha indicated that the

restrictions dated back to 2010, the ALJ noted that Plaintiff successfully worked until May 2015.

Tr. 29-30, 210, 253. While Ms. Delgosha opined that Plaintiff could not understand short and simple instructions or work in close proximity to others without being unduly distracted, Plaintiff testified otherwise. Tr. 30, 58-61, 466. At the hearing, the ALJ asked Plaintiff if he would be able to understand and carry out instructions to get a broom and sweep a floor, to which Plaintiff answered in the affirmative, denoting that he had no difficulty performing and understanding simple tasks. Tr. 30, 58. Similarly, Plaintiff testified that he had no difficulty working in proximity to his coworkers in a call center and he reported no problems getting along with others. Tr. 30, 58-60, 222-24. Furthermore, although Ms. Delgosha opined that Plaintiff had a limited ability to be aware of normal hazards, Plaintiff testified that he was more cautious than the average person, and thus would likely be acutely aware of most workplace hazards. Tr. 30, 60, 466.

Additionally, although Ms. Delgosha opined that Plaintiff had "no useful ability" to maintain attention for two-hour segments, Plaintiff demonstrated intact attention and concentration during the consultative examination, and Plaintiff admitted that he had no problems paying attention and spent all day watching television or playing video games. Tr. 20, 27, 28, 217, 223, 327-28, 466, 553. Ms. Delgosha also opined that Plaintiff was limited in his ability to maintain socially appropriate behavior and his ability to maintain regular attendance and be punctual within customary tolerances. Tr. 466-67. However, Plaintiff testified that he could maintain socially appropriate behavior. Tr. 61. The record indicated that Plaintiff was generally on time for his appointments, and although he appeared "immature," he was otherwise cooperative and pleasant with a fair manner of relating and appropriate behavior. Tr. 283, 316, 321, 327, 528, 530, 544-638. He also reported socially appropriate behaviors such as helping a friend move and helping a woman load her car. Tr. 27, 494, 565. As the ALJ properly found, other evidence contradicted Ms. Delgosha's opinion of disabling mental restrictions. Tr. 29-30. *See Freeman v. Comm'r of Soc.*

*Sec.*, No. 17-CV-6862-FPG, 2018 WL 6605666, at *6 (W.D.N.Y. Dec. 17, 2018) ("[T]he ALJ did not err when she discounted [an] opinion based on its inconsistency with other record evidence."); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (an ALJ will give more weight to an opinion that is consistent with the record as a whole).

Plaintiff argues that the ALJ should have obtained Ms. Delgosha's treatment records prior to issuing his decision. *See* ECF No. 10-1 at 27-28. While an ALJ has a general duty to develop the record in light of the essentially non-adversarial nature of a benefits proceeding, *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009), it is Plaintiff's burden to provide evidence supporting his claim of disability. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.").

At the hearing, Plaintiff's attorney indicated that she would obtain the treatment notes from Ms. Delgosha, and the ALJ left the record open to allow Plaintiff's attorney time to obtain this evidence, thereby satisfying his duty to develop the record (Tr. 41-42). *Cf. Brown v. Colvin*, No. 3:14-cv-1784 (WIG), 2016 U.S. Dist. LEXIS 66527, at *7 (D. Conn. May 20, 2016 ) ("When an ALJ holds open the record . . . , the ALJ will be found to have fulfilled her duty to develop the record."); *Wozniak v. Comm'r of Soc. Sec.*, No. 1:14- CV-00198, 2015 WL 4038568, at *9 (W.D.N.Y. June 30, 2015) (ALJ satisfied the duty to develop the record by relying on counsel to obtain additional medical documentation). After the hearing, Plaintiff's attorney did not submit any treatment notes or request the ALJ's assistance in obtaining records from Ms. Delgosha or from WNY Psychotherapy. After almost four months, the ALJ issued a decision based on the evidence submitted. Tr. 15-33. There was nothing improper about the ALJ's actions. *Cf. Jordan v. Comm'r of Soc. Sec.*, 142 F. App'x 542, 543 (2d Cir. Sept. 8, 2005) (finding no error for failure to

develop the record where claimant's counsel volunteered to obtain the records, the ALJ kept the record open to allow supplementation of the record, and claimant did not request the ALJ's assistance in securing additional evidence).

Furthermore, an ALJ need not further develop the record "when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" *See Janes v. Berryhill*, 710 F.App'x 33, 34 (2d Cir. Jan. 30, 2018) (summary order (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996). *see also Morris v. Berryhill*, 721 F. App'x 25, 27-28 (2d Cir. 2018) (summary order) (explaining that the mere "theoretical possibility" of missing records that might be probative of disability "does not establish that the ALJ failed to develop a complete record"). Moreover, as discussed above, the ALJ provided more than ample reason for discounting Ms. Delgosha's opinions. The record before the ALJ sufficiently documented Plaintiff's mental impairments and treatment, and the ALJ was not obligated to seek out additional records from Ms. Delgosha. Plaintiff's attempts to argue otherwise are meritless. As detailed above, substantial evidence in the record supports the ALJ's RFC finding. When "there is substantial evidence to support either position, the determination is one to be made by the fact-finder." *Davila-Marrero v. Apfel*, 4 F. App'x 45, 46 (2d Cir. Feb. 15, 2001) (citing *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990)).

Plaintiff here failed to meet his burden of proving that no reasonable factfinder could have reached the ALJ's findings on this record. *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court must "defer to the Commissioner's resolution of conflicting evidence" and reject the ALJ's findings "only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at *3 (2d Cir. Jan. 18, 2018)

(internal citations and quotations omitted). In the end analysis, there is nothing more to discuss, and the Court finds no error in the ALJ's analysis.

## <u>CONCLUSION</u>

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 10) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 16) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE